IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JEFFERY D. SEARER, | ) Case No. 3:18-CV-1035 |
| | ) |
| Plaintiff, | ) JUDGE JACK ZOUHARY |
| | ) |
| v. | ) MAGISTRATE JUDGE |
| | ) THOMAS M. PARKER |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) **REPORT & RECOMMENDATION** |
| Defendant. | ) |

**I.   Introduction**

Plaintiff, Jeffery Searer, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the Administrative Law Judge's ("ALJ") failure to discuss explicitly whether Searer had an impairment or combination of impairments that met or medically equaled Listing 1.04C was harmless error, I recommend that the Commissioner's denial of Searer's application for DIB be AFFIRMED.

**II.   Procedural History**

On January 27, 2014, Searer applied for DIB. (Tr. 417–23).[1] Searer alleged that he became disabled on March 8, 2013, due to "back problems, spinal stenosis, neck pain causing headaches, numbness in right arm, heart problems attack last march, anxiety attacks, [and] left

---

[1] The administrative transcript is in ECF Doc. 15.

knee pain." (Tr. 299, 313, 417). The Social Security Administration denied Searer's application initially and upon reconsideration. (Tr. 299-328). Searer requested an administrative hearing. (Tr. 344–45). ALJ Amy Budney heard Searer's case on August 23, 2016, and denied the claim in a March 8, 2017, decision. (Tr. 12-26, 263–98). On March 5, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1–6). On May 3, 2018, Searer filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

**III.    Evidence**

    **A.    Personal, Educational and Vocational Evidence**

Searer was born on July 6, 1968, and he was 44 years old on the alleged onset date. (Tr. 417). Searer completed the 10th grade, and he had a GED. (Tr. 25, 268, 288). Searer had prior work experience as a welder and rolling machine operator. (Tr. 24–25, 268).

    **B.    Relevant Medical Evidence**

The record contains, and Searer cites, medical evidence from before and after his alleged March 8, 2013 disability onset date.

        **1.    Pre-Onset Date Evidence**

On November 8, 2011, Searer had an MRI of his lumbar spine. (Tr. 891–92, 920–21). Nicole Nelson, MD, reviewed the MRI and found that Searer's lumbar vertebral bodies were normally aligned; there were no compression factures; distal spinal cord, conus medullaris, and cauda equina were within normal limits; there was an isolated disc desiccation at L5-S1; there was mild loss of disc height at L5-S1; there were no degenerative changes at L1-L2; there were mild facet degenerative changes at L2-L5, but no disc abnormality or stenosis; and there was a focal central/left central disc protrusion at L5-S1. (Tr. 891–92). Dr. Nelson also noted that there was a mild spinal canal stenosis at L5-S1 and a mass effect on the descending left S1 nerve root

2

sleeve. (Tr. 892). There was moderate bilateral foraminal stenosis at L5-S1, and mild bilateral foraminal stenosis at L3-L5. (Tr. 892). Searer also had an MRI of his left hip, which showed that his joints were within normal limits and had no significant degenerative changes. (Tr. 894).

On November 15, 2011, Searer saw Frank Fumich, MD, for treatment of his low back pain and leg pain. (Tr. 933–35). Searer told Dr. Fumich that he continued to walk despite his pain, but he had difficulty with some daily living activities and limited himself to necessary activities. (Tr. 933). On examination, Dr. Fumich noted that Searer did not have any gait problems or need for an assistive device when walking. (Tr. 934). Searer's spine posture and lower extremity alignment was normal. (Tr. 934). He had full strength in his lower extremities, and he was able to perform ten heel raises bilaterally. (Tr. 934). Imaging showed no significant stenosis or instability in Searer's spine, but there was disc herniation at L5-S1. (Tr. 934). Dr. Fumich recommended a microdiscectomy. (Tr. 935). Dr. Fumich performed the microdiscectomy on November 21, 2011, after which Searer's S1 nerve root relaxed and no stenosis remained. (Tr. 901–02). At a follow-up on December 6, 2011, Dr. Fumich noted that Searer was healing well, maintained full strength with knee extensions, and did not use any pain medications. (Tr. 931). Dr. Fumich concluded that Searer's radiculopathy and spinal stenosis with neural claudication were resolved. (Tr. 931). On January 3, 2012, Searer told Dr. Fumich that his leg pain had returned. (Tr. 929). On examination, Dr. Fumich noted that Searer had full strength in his legs, and that his back was stable. (Tr. 929). On January 24, 2012, Searer told Dr. Fumich that he wanted to return to work, and Dr. Fumich noted that there was no evidence of recurrent disc herniation or spinal stenosis, but there was some narrowing of the foramina at L4-S1. (Tr. 927).

On January 24, 2012, Pradeep Amesur, MD, reviewed an MRI of Searer's lumbar spine. (Tr. 537–38). The MRI showed spondylosis, disc displacement, mild facet atropathy, mild

3

narrowing, and pressure on the S1 nerve root. (Tr. 537–38). Dr. Amesur did not note any pseudoclaudication. (Tr. 537–38).

On May 17, 2012, Searer told Dr. Fumich that he had significant difficulty at work, and that stretching at home helped his back pain. (Tr. 653). On examination, Dr. Fumich noted that Searer had full strength and range of motion in his legs. (Tr. 653). Dr. Fumich noted that Searer had spinal stenosis with neurogenic claudication, and he recommended physical therapy and chiropractic care. (Tr. 654).

On June 6, 2012, Searer told chiropractor Adam Osenga, DC, that his back pain caused him to have trouble standing, walking, stooping, bending, lifting, pushing, pulling, and riding in a car. (Tr. 539). On examination, Dr. Osenga noted that Searer's spine was tender, and he had abnormally high tension in his lower back muscles. (Tr. 539). He tested positive for straight leg raising. (Tr. 540). Dr. Osenga diagnosed Searer with lumbar segmental dysfunction, lumbar spinal stenosis, displacement of lumbar intervertebral disc without myelopathy, thoracic spine pain, cervicalgia, thoracic segmental dysfunction, sacral segmental dysfunction, and cervical segmental dysfunction. (Tr. 540). Dr. Osenga recommended that Searer receive physical therapy and chiropractic manipulative therapy, as well as maintain a home exercise program to strengthen his back. (Tr. 540). From June 8, 2012, through June 15, 2012, Searer attended four chiropractic manipulation sessions and three physical therapy sessions. (Tr. 542–47). At his last session, Dr. Osenga noted that Searer's diagnosis remained the same, but he responded favorably to treatment and "objective findings [were] improving." (Tr. 547).

On June 10, 2012, Searer told Dr. Fumich that he did not improve with physical therapy and wanted additional treatment. (Tr. 650). On examination, Dr. Fumich noted that Searer had full strength in his lower extremities, tested positive for straight leg raise, and had pain in his leg with motion. (Tr. 650–51). X-rays showed that Searer's spine had well-maintained alignment,

4

but an MRI showed that he had "severe stenosis" at L5-S1. (Tr. 651). Dr. Fumich diagnosed Searer with spinal stenosis of the lumbar region with neurogenic claudication and recommended surgery. (Tr. 651). On August 17, 2012, Dr. Fumich performed a lumbar fusion and posterolateral fusion surgery. (Tr. 548–50). At follow-ups on September 6 and October 30, 2012, Searer told Dr. Fumich that his back and leg felt completely comfortable, he was "doing very well getting around," he was able to put a roof on his shed, and he was going back to work. (Tr. 644, 646).

### 2.     Post-Onset Date Evidence

On March 19, 2013, Searer told Dr. Fumich that he had increased pain in his back and leg from work activities. (Tr. 640). On examination, Dr. Fumich noted that Searer had full strength in his lower extremities and could walk without an assistive device; however, his gait was mildly antalgic. (Tr. 640). Dr. Fumich prescribed a pain medication and told Searer to take two weeks off work. (Tr. 641). He also scheduled Searer for an MRI. (Tr. 641). Before Searer could get his scheduled MRI, he was hospitalized for a heart attack. (Tr. 638; *see also* Tr. 564–66). On May 14, 2013, Searer had a follow-up appointment with Dr. Fumich, and reported that he continued to have pain in his lower back and left leg. (Tr. 638). Dr. Fumich noted that Searer did not use an assistive device for walking, and that he did not have any gait problems. (Tr. 638). Searer had full strength in his lower extremities. (Tr. 638).

On May 30, 2013, Searer had an MRI of his lumbar spine. (Tr. 626–27). Jene Burk, MD, found that Searer had nominal disc bulges at L1-L3, mild facet arthropathy and hypertrophy at L3-L4, posterior disc displacement that abutted the nerve roots at L5-S1, and disc dehydration at S1. (Tr. 626). Dr. Fumich discussed the findings with Searer and noted that Searer walked without an assistive device and did not have gait issues. (Tr. 648). Dr. Fumich recommended that Searer receive physical therapy and exercise. (Tr. 649). On September 24, 2013,

5

Dr. Fumich noted that Searer was unable to return to work due to his back pain.  (Tr. 635). Dr. Fumich noted that Searer had full strength on knee extensions, and restricted Searer from performing any prolonged bending, standing, or working.  (Tr. 635–36).  Dr. Fumich encouraged Searer to walk, cycle, and exercise to help his symptoms.  (Tr. 636).

On April 2, 2014, Searer began physical therapy for neck and lower back pain, upon referral from Dr. Fumich.  (Tr. 705).  Between April 2, 2014, and May 6, 2014, Searer attended nine physical therapy sessions.  (Tr. 705–39).  At discharge, Searer told his physical therapist that his neck pain was reduced to 1/10, but occasionally still shot to his right shoulder.  (Tr. 737). Searer said that he continued to do posture and position exercises and avoid neck retractions that aggravated his symptoms.  (Tr. 737).

On June 10, 2014, Kathy Carr, Ph.D., conducted a psychological consultative examination.  (Tr. 740–49).  During the examination, Searer told Dr. Carr that he performed light household chores, cooked, grilled, washed the dishes, mowed the lawn, and shopped twice a month.  (Tr. 742).  He also said that he enjoyed fishing and playing ball with his kids, and that he had a classic car he wanted to fix up but lacked the funds to do so.  (Tr. 742).

On July 8, 2014, Searer told Dr. Fumich that he continued to have neck pain but improved from his physical therapy.  (Tr. 939).  On examination, Dr. Fumich noted that Searer had full strength in his arms and hands, and he ordered an MRI.  (Tr. 939).  Searer's MRI showed that he had moderate arthrosis and mild degenerative changes in his cervical spine. (Tr. 758, 944).  At a follow-up on August 12, 2014, Searer told Dr. Fumich that his neck pain got worse when he walked or performed work activities around the house.  (Tr. 937).  On examination, Dr. Fumich noted that Searer had full strength in his upper extremities, full range of motion, cervical disc herniation, and mild disc protrusion causing some stenosis.  (Tr. 937). Dr. Fumich prescribed a pain reliever, physical therapy, and home exercise.  (Tr. 938).

On March 2, 2016, Searer saw chiropractor Thomas Morris, DC, for treatment of his back pain. (Tr. 829–31). Searer told Dr. Morris that he had difficulty leaning forward, getting dressed, picking things up from the floor, putting on socks and shoes, bending, twisting, and sitting longer than 30 minutes. (Tr. 829). A sitting straight leg raise test was positive on the left side, and a lumbosacral compression test was positive bilaterally. (Tr. 830). Dr. Morris noted that Searer's condition was severe, and that he would respond favorably to chiropractic care. (Tr. 830). Between March 2, 2016, and March 25, 2016, Searer attended nine chiropractic manipulation sessions. (Tr. 829–47). On March 25, 2016, Dr. Morris noted that Searer made slow but steady progress, and that his ability to sit comfortably had improved. (Tr. 846). Dr. Morris recommended that Searer continue to receive chiropractic care twice a week. (Tr. 846).

On July 12, 2016, Searer told Evette Shaner, CNP, that he wanted to hold off on a cervical fusion surgery that Dr. Fumich had recommended. (Tr. 947). Shaner noted that Searer was treating his cervical pain conservatively through physical therapy. (Tr. 947). On examination, Shaner noted that Searer did not use any assistive devices for ambulation or have any gait problems. (Tr. 947–48).

      **C.**     **Relevant Opinion Evidence**

          **1.**     **Treating Physician—Joel Knerr, MD**

On August 1, 2016, Joel Knerr, MD, wrote a letter, stating that Searer was unable to complete an 8-hour workday on a sustained basis due to osteoarthritis, coronary artery disease, and acute myocardial infarction of inferolateral wall. (Tr. 946). Dr. Knerr stated that Searer needed frequent work breaks and would not be able to complete 2 hours of sedentary work without a break. (Tr. 946).

7

### 2. Consultative Examiner—Babatunde Onamusi, MD

On October 24, 2016, Babatunde Onamusi, MD, examined Searer on referral from the Ohio Division of Disability Determination. (Tr. 966–89). Dr. Onamusi determined that Searer had full strength in his upper extremities; 4/5 strength in his lower extremities; normal grasp, manipulation, pinch, and fine coordination; spasticity in his left leg; non-sustained bilateral ankle clonus; reduced range of motion in his cervical spine and dorsolumbar spine; and normal range of motion in his upper and lower extremities. (Tr. 966–69). Dr. Onamusi found that Searer could occasionally lift and carry up to 10 pounds, but never lift or carry more than 10 pounds. (Tr. 970). He could sit for 30 minutes, stand for 15 minutes, and walk for 20 minutes without interruption. (Tr. 971). In an 8-hour workday, Searer could sit for five hours, stand for two to three hours, and walk for two hours. (Tr. 971). Searer could occasionally operate foot controls, climb stairs and ramps, and balance, but he could never climb ladders or scaffolds, stoop, kneel, crouch, and crawl. (Tr. 972–73). He could travel without a companion for assistance, shop with some limitations, ambulate without an assistive device, use standard public transportation, and climb a few steps at a reasonable pace using a handrail; however, he could not walk a block at a reasonable pace on rough or uneven surfaces. (Tr. 975).

In his report to the Division of Disability Determination, Dr. Onamusi stated that Searer could sit for three minutes, stand for three minutes, walk one block, and lift or carry seven pounds. (Tr. 978). He stated that Searer could not do house work, grocery shopping, or laundry, but could take care of himself and drive. (Tr. 978). Searer had no trouble transferring onto and off the examination table. (Tr. 979). Dr. Onamusi stated that Searer walked with an abnormal left leg swing, had a mild spastic gait, and could not squat or walk on his heals or toes. (Tr. 979).

8

### 3. State Agency Consultants

On May 12, 2014, state agency consultant Teresita Cruz, MD, evaluated Searer's physical abilities based on a review of his medical records. (Tr. 305–07). Dr. Cruz found that Searer could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand and/or walk for up to 6 hours in an 8-hour workday, and sit for up to 6 hours in an 8-hour workday. (Tr. 305–06). Searer could frequently climb ramps/stairs, crouch, and crawl. (Tr. 306). He could never climb ladders, ropes, or scaffolds. (Tr. 306). He was unlimited in his ability to balance and kneel. (Tr. 306). Dr. Cruz determined that Searer had the residual functional capacity ("RFC") to perform light work. (Tr. 310). On October 14, 2014, state agency consultant Stephen Sutherland, MD, concurred with Dr. Cruz's opinion. (Tr. 321–23, 326).

### D. Relevant Testimonial Evidence

Searer testified at the ALJ hearing. (Tr. 266–88). He testified that he lived in a house with his wife and two children. (Tr. 266–67). He had a driver's license, but drove as little as he had to, because "[d]riving irritate[d his] back immensely and [his] neck immensely." (Tr. 267). He drove to the hearing, which took a little over half an hour, and he said that his neck and back hurt "really bad" by the time he got to the hearing. (Tr. 267–68). He spent most of his day in a recliner with his legs raised. (Tr. 274, 278, 280). He used a tablet computer to shop online and play games, and he could take a shower, washing his hair, and getting dressed without assistance. (Tr. 278). His wife did almost all the chores at home and all the grocery shopping. (Tr. 279). Searer stated that he used to fish, but last fished a year and a half before the hearing. (Tr. 280). Sometimes he sat on the floor to play games with his kids. (Tr. 280). He went to about two of his daughter's soccer games each year. (Tr. 281).

Searer testified that he last worked for a manufacturing company, as a welder for four years and a rolling machine operator for one year. (Tr. 268). In both positions, he lifted up to

9

100 pounds. (Tr. 268). He said that his lower back, neck, and heart prevented him from working. (Tr. 271). His heart issues caused shortness of breath and difficulty climbing stairs. (Tr. 271, 277). His back issues caused discomfort with sitting, and he needed to be able to move while sitting. (Tr. 271). He also did not bend, stoop, or crouch due to back pain. (Tr. 287). His back pain was at a 5 out of 10 all the time, bot got worse with certain activities. (Tr. 271). Sitting and driving caused neck discomfort, and he had difficulty when rising too fast from a seated position. (Tr. 271). He also had three discs that needed to be replaced in his neck, and those caused him pain. (Tr. 271). He also had pain and some difficulty lifting his left leg, which started after bone from his hip was used to replace bone in his spine. (Tr. 272). His leg pain was "not that bad" when he was sitting, but it got worse with extensive walking and crouching did. (Tr. 272). He also had pain, twitching, and occasional tingling in his right arm. (Tr. 281).

Searer testified that he could sit for 10 minutes before he started to fidget, or 2 to 3 minutes if he could not keep his legs up. (Tr. 273). He could stand for 4 to 5 minutes. (Tr. 273). He could lift and carry "[a]bout a gallon of milk," but he sometimes dropped them due to arthritis in his hands. (Tr. 273). Searer got chest pains when he exerted himself. (Tr. 275). He took nitro pills, aspirin, Lipitor, Plavix, Lexapro, Norco, Cozaar, Ativan, Piroxicam, Nitrostat, magnesium oxide, and finasteride. (Tr. 275). His medications made him dizzy when he stood up too fast, and they made him sleep. (Tr. 276). He had a surgery, after which he did fine for a while, but his symptoms persisted. (Tr. 281–82). He used while recovering from surgery. (Tr. 282).

**IV.     The ALJ's Decision**

The ALJ's March 8, 2017, decision found that Searer was not disabled and denied his application for DIB. (Tr. 12–26). The ALJ found that Searer met the insured status requirements through December 31, 2018 and had not engaged in substantial gainful activity since March 8, 2013. (Tr. 14–15). The ALJ found that Searer had the severe impairments of:

> coronary artery disease, ischemic cardiomyopathy, ST elevation myocardial infarction on March 27, 2013 status post percutaneous transluminal coronary angioplasty; cervical radiculopathy; adjustment disorder with anxiety; osteoarthritis; depression; cervical disc herniation; radicular syndrome of the upper limb; cervical spondylosis with myelopathy; history of lumbar stenosis; history of lumbar herniation; status post L5-S1 microdiscectomy; status post fusion L4-S1; history of lumbar radiculopathy; and degenerative disc disease of the cervical and lumbar spine.

(Tr. 15).

The ALJ determined that Searer had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15). In evaluating whether Searer's physical impairments met or medically equaled the severity of a listed impairment, the ALJ stated that:

> No treating or examining physician indicated findings consistent with the record as a whole that would satisfy the severity requirements of one of the listed impairments. * * * The undersigned considered the claimant's physical impairments under the requirements of Listing 1.04 regarding disorders of the spine, but there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain with motor loss, sensory or reflex loss, and positive straight-leg raising testing (both sitting and supine) or spinal arachnoiditis. Furthermore, the claimant is not extremely limited in the ability to walk as required by 1.00B2b.

(Tr. 15–16).

The ALJ determined that Searer had the RFC to perform sedentary work, except that:

> [T]he claimant can lift and carry 10 pounds occasionally. The claimant can sit 30 minutes at a time for a total of 5 hours in an 8-hour work day. The claimant can stand 15 minutes at a time for a total of 3 hours in an 8-hour workday. The claimant can walk 20 minutes at a time for a total of 2 hours in an 8-hour work day. The claimant can frequently reach overhead and in all directions bilaterally.

11

> The claimant can frequently handle, finger, and feel bilaterally. The claimant can occasionally push and pull in the upper extremities. The claimant can occasionally use foot controls bilaterally. The claimant can occasionally climb ramps and stairs. The claimant can occasionally balance. The claimant should never climb ladders, ropes, and scaffolds; kneel; stoop; crouch; or crawl. The claimant should never be exposed to unprotected heights. The clamant can occasionally be exposed to dangerous moving mechanical parts and operate a motor vehicle. The claimant can occasionally be exposed to humidity, wetness, extreme cold, extreme heat, vibrations, and dust, odors, fumes, and pulmonary irritants. The claimant can be exposed to loud noise. . . . The claimant can understand, remember, and carry out simple, routine, and repetitive tasks, but not at a production rate pace (e.g., assembly line work). The claimant can occasionally tolerate changes in the routine work setting. Changes should be explained and introduced slowly.

(Tr. 17–18). Because the ALJ found that Searer was unable to perform all or substantially all of the requirements of sedentary work, she relied on a vocational expert's testimony to determine whether Searer could perform a significant number of jobs at the sedentary level with additional limitations. (Tr. 25–26). Based on a vocational expert's testimony and considering Searer's RFC, age, education, and experience, the ALJ found that Searer was able to work as a final assembler, surveillance system monitor, and touch-up screener. (Tr. 25, 289–97). In light of his findings, the ALJ determined that Searer was not disabled from March 8, 2013, through the date of her decision and denied Searer's application for DIB. (Tr. 26).

## V. Law & Analysis

### A. Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. § 405(g) (providing that, if the

12

Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will

13

not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a).

### B. Step Three – Listing for Disorders of the Spine

Searer advances only one claim of error, arguing that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in evaluating whether his spine impairments met or medically equaled Listing 1.04C – the listing for lumbar spinal stenosis. ECF Doc. 16 at 6–12. Searer acknowledges that the ALJ evaluated whether he met: (1) Listing 1.04A's nerve root compression, sensory or reflex loss, and positive straight-leg raising testing requirements; and (2) Listing 1.00B2b's inability to effectively ambulate requirement. *Id.* at 10–11. He argues that the ALJ did not adequately evaluate whether his back impairments met or medically equaled Listing 1.04C – the listing for lumbar spinal stenosis. *Id.* at 11–12. Further, Searer contends that substantial evidence – including clinical findings showing lumbar spinal stenosis with pseudoclaudication and Dr. Onamusi's opinion that he could not walk a block at a reasonable pace on rough or uneven surfaces – supported a finding that he met or medically equaled Listing 1.04C. *Id.* at 7–12. Searer asserts that, because the ALJ said he gave Dr. Onamusi's opinion great weight, the ALJ should have explained why he rejected Dr. Onamusi's opinion regarding his ambulation limitations in evaluating whether he had an impairment or combination of impairments that met or medically equaled a listed impairment. *Id.* at 12.

The Commissioner responds that the ALJ was not required to expressly evaluate whether Searer met Listing 1.04C, because Searer clearly did not meet that listing and did raise that listing before the ALJ. ECF Doc. 17 at 6–7. Specifically, the Commissioner argues that Searer clearly did not meet Listing 1.04C because the record did not contain any evidence that he had pseudoclaudication or nonradicular pain that lasted for 12 months before the alleged onset date. *Id.* at 7–8. The Commissioner notes that, although Dr. Fumich found pseudoclaudication in November 2011, it was resolved by December 2011, after Searer had a discectomy. *Id.* at 7. Finally, the Commissioner argues that, even if the ALJ failed to adequately evaluate whether

15

Searer had an impairment or combination of impairments that met or medically equaled Listing 1.04C, that error was harmless because Searer has not shown that he could satisfy the requirements of Listing 1.04. *Id.* at 8–9.

At Step Three, the clamant has the burden to prove that he has an impairment or combination of impairments that meet or medically equal a listed impairment. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). The claimant is conclusively presumed disabled if he meets or medically equals a listed impairment; otherwise, the evaluation proceeds to the fourth step. 20 C.F.R. § 1520(d)–(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A clamant must satisfy all of the criteria to meet the listing."). "If . . . the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013) (quotation and alterations omitted); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (holding that the ALJ erred by not conducting any step three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain). Nonetheless, "the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks*, 544 F. App'x at 641. When an ALJ failed to adequately explain why the claimant's impairments did not meet or medically equal a listed impairment, that error is harmless if the claimant does not produce sufficient evidence to show that his impairments met or medically equaled a listed impairment. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014); *see also Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) (stating that, when an ALJ "did not explicitly state that the appellant's impairments were not contained in the

16

listings, such a determination was implicit in the ALJ's decision" because he proceeded to Step Four).

Listing 1.04 is used to determine whether a claimant's spine disorder "result[s] in compromise of a nerve root . . . or the spinal cord," with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication,[2] established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04. To be unable to effectively ambulate, a claimant must have "an extreme limitation of the ability to walk." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.00B2b(1). In determining whether a claimant has such an extreme limitation, the ALJ must consider whether the:

> [I]ndividual [ is] capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

---

[2] Pseudoclaudication, also known as neurogenic claudication, is the most common symptom associated with spinal stenosis. *See* Lisa A. Forris and Matthew Varacallo, *Spinal Stenosis and Neurogenic Claudication* (last updated October 27, 2018), *available at* NAT'L CTR. FOR BIOTECHNOLOGY INFO., https://www.ncbi.nlm.nih.gov/books/ NBK430872/.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.00B2b(2).

The ALJ's should have discussed whether Searer had an impairment or combination of impairments that met or medically equaled Listing 1.04C, but his failure to do so was harmless error. Because Searer produced evidence that that he had lumbar stenosis with neurogenic claudication and ambulation difficulties, it was not clear that Searer's impairment did not meet Listing 1.04C and ALJ was required to evaluate whether he met that listing. *Sheeks*, 544 F. App'x at 641; *Reynolds*, 424 F. App'x at 415–16; (Tr. 267–68, 272–74, 278–80, 537–38, 540, 640, 651, 654, 829–30, 892, 966–69, 971, 975, 978, 979); *see also* (Tr. 15) (recognizing Searer's history of lumbar stenosis as a "severe impairment"). Thus, Searer is correct that the ALJ erred by failing to discuss Listing 1.04C. Nevertheless, the ALJ's failure to explicitly discuss whether Searer's lumbar stenosis met or medically equaled Listing 1.04C is harmless, because the ALJ implicitly found that Searer did not have an impairment or combination of impairments that met Listing 1.04C when he: (1) found that Searer did not meet the ambulation limitation requirements of Listing 1.00B2b, which is incorporated into Listing 1.04C; and (2) proceeded to Step Four. *Hutchinson*, 787 F.2d at 1463; 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.00B2b(2), 1.04C; (Tr. 15–17). Further, Searer has not shown that he met Listing 1.00B2b, and, thus, cannot show that he met the requirements of Listing 1.04C. *Forrest*, 591 F. App'x at 366; 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.00B2b(2), 1.04C. Here, the ALJ's conclusion that Searer did not meet the extreme ambulation limitation requirements in Listing 1.00B2b was supported by substantial evidence, including: (1) treatment notes indicating that Searer could walk without assistance, did not have any gait problems, resolved his neurogenic claudication through surgery, could improve his symptoms through physical therapy and exercise; and (2) his own statements that he was able to do household chores, shop, mow his lawn, and fish. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.00B2b(2), 1.04C; (Tr. 305–06, 321–23, 635–36, 638, 650, 644, 646, 648–51, 653,

18

737, 742, 901–02, 927, 929, 931, 934, 938–39, 946–48, 975, 979). Accordingly, the ALJ's failure to discuss explicitly whether Searer had an impairment or combination of impairments that met or medically equaled Listing 1.04C was harmless error.

## VI. Recommendation

Because the ALJ's failure to discuss explicitly whether Searer had an impairment or combination of impairments that met or medically equaled Listing 1.04C was harmless error, I recommend that the Commissioner's denial of Searer's application for DIB be AFFIRMED.

Dated: March 20, 2019

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).